Good morning ladies and gentlemen. The first case this morning is United States v. Heon Seok Lee and Mr. Brandt. Thank you. May it please the court. Count 6 through 8 of the indictment charged Heon Seok Lee with violation of the second paragraph of 18 U.S.C. section 545, which applies only to someone who fraudulently or knowingly imports or brings into the United States any merchandise contrary to law. And that phrase contrary to law, you have to look elsewhere to find out where it's contrary to law. But the most important point here is that the phrase contrary to law applies to the act of importing or bringing into the United States. It does not apply to the condition of the merchandise that's being brought in. And that's exactly what the United States is trying to do. But this isn't a condition of the merchandise. This was the marking of the merchandise. And I'm not quite sure why you're equating condition with a false marking. Well, Your Honor, first of all, the marking took place in Korea, not United States. And it came here with that mark already on it. So the act of importing it necessarily entails the condition of it having that mark on there. But nonetheless, what the focus is that something has to be prohibited by law. And our position is, Your Honor, that the title of the act, the smuggling act, the statutes provisions itself and the case law all show that it's the act of importing some kind of merchandise that is barred entry into the United States. Well, it doesn't say barred entry. It says contrary to law. And that provision refers to containers or merchandise itself. The marking, the contrary to law provision, when you look elsewhere to see, what if on the outside of the container he had marked it as something that it wasn't? Say he marked it as broccoli when it was really spinach. Would that be importing contrary to law? No, because it might be a violation of the first paragraph of 545 because he's providing false documentation. But that's not the case here. This was clearly marked on the outside and on all the paperwork as having come from Korea. So there was no false documentation. Even if there was, he wasn't charged with it. So something like that is just not relevant to this particular case. So contrary to law just means contrary to a particular kind of law. Correct. The term smuggling itself. Which isn't used in the section that your client was... That's true, but it's the title of the act. And it has, over 100 years ago, the United States Supreme Court said it has a commonly understood meaning. And what that is, is bringing onshore goods of which the importation is prohibited. And if your client had been charged with the first section, I think you would have a good argument. But the second section doesn't use the word smuggling, and so it seems to be designed to capture something else. Counsel, before I let this go, I just wanted to make a comment about your combined response reply brief. You used almost that entire brief as a reply. So you essentially rehashed the opening, whereas if you had really done just a reply, you would have been allocated very few words. And instead of actually using that response to respond to the cross-appeal, you essentially way went over the limit. Your Honor, I... That was not an ideal choice. I apologize to the court. I have not had that kind of appeal before, where there was a cross-appeal and so on. So I didn't see anything prohibiting that in the rules, but I'll take your counsel to... Think spirit, if not letter there. I understood, Your Honor. In any event, you have to look elsewhere to see whether there's some kind of statute that prohibits importing these goods into the United States. The only statute, and by the way, the case law says that in the indictment itself, the government has to cite the statute that prohibits it. And the only statute they cite is 19 U.S.C. 1304. But there's nothing in 1304 that prohibits importing turbo blowers, period. There's nothing in 1304 that prohibits importing even mismarked merchandise. To the contrary, 1304 expressly contemplates that mismarked merchandise is going to come into customs. That's going to happen. And there's a lot of reasons for that, including the complicated determination of what the country of origin is. It's not a very simple determination. In fact, we have the World Trade Court and other mechanisms set up to figure that all out. And that's why under 1304, they acknowledge you're going to bring in, people are going to bring in mismarked merchandise. That's not prohibited. And consequently, the importation of mismarked merchandise is not prohibited. It's not contrary to law. What's supposed to happen at that point is the center director is supposed to give written notice to the importer, hey, you mismarked this. This isn't made in the USA. It's made in Korea. Remark it. That's the procedure that's supposed to be followed. What's not supposed to happen under that statute is that the goods are immediately seized and the importer is arrested. That's not the administrative and civil procedure that was set up in that statute and under the Tariff Act. This was a purely administrative civil procedure, not a criminal procedure. There's nothing in there that prohibits this. What they are trying to do, what the government's trying to do is turn an affirmative obligation to mark the country of origin into an applied prohibition, not just of mismarking, but of importing mismarked goods. And there's simply no support for that anywhere in the statute itself, in the Tariff Act, or anywhere else. And are you making this argument based upon the letter of the indictment or based upon the government's statutory argument? Well, both, but mainly the statutory argument. They had to cite which statute they're relying on to show it's contrary to law, and they cited only 1304. And there's no reasonable interpretation of 1304 that would prohibit importing mismarked goods. And consequently, importing mismarked goods is not contrary to law. It simply isn't. It certainly isn't criminal. There's no evidence whatsoever that Congress intended to make that a criminal act. In fact, to the contrary, everything about the Tariff Act shows that they had meant to apply only civil, perhaps monetary penalties with additional duties. But that's it. Nobody's going to end up in jail. Nobody's going to get charged with a crime for mismarking it. Again, that's a complicated determination because a lot of goods, a lot of merchandise are built in many different countries. It's a question of predominance. It's a question of where substantial transformation happens. Those are all things that are litigated civilly and not criminally. Congress showed what it wanted to criminalize, which is after something is imported, and then it's accurately marked with its country of origin. If somebody defaces that, removes it, or hides it, that's not what Han was charged with. That's not even relevant here. So the only aspect that Congress intended to criminalize is totally irrelevant. There's nothing in 1304 that prohibits or makes it contrary to law for what K-Turbo did in this case or what Han did. They're trying to show associative liability for it. The only case that they cite in support of their proposition is the Hassan Zadi case, but that actually supports our position. In that case, the defendant was importing carpets that were made in Iran, but there was an executive order and implementing regulations which prohibited the importing of any goods from Iran that originated in Iran or that were made in Iran. And so that is exactly our interpretation here, is that the actual category or type of good has to be prohibited entry absolutely into the United States without regard to the labeling. In Hassan Zadi, the court didn't even talk about the labeling, other than to point out some of them weren't even correctly marked. And yet he was still guilty of smuggling, showing that labeling has nothing to do with smuggling or a violation of Section 545. We have a lot to cover, so I'd like to move on unless anybody has any questions on that. But under Counts 1 through 5, Han was charged with wire fraud. And to establish wire fraud, the government has to prove there was an alleged scheme to defraud. In this case, the scheme alleged in the indictment and presented with evidence at trial, or at least what they hoped to provide, was that Han gave a false promise to provide compliant blowers, turbo blowers, that were compliant with Section 1605 of the Recovery Act. But the facts alleged and proved at trial, or presented at trial, showed that there was no such scheme and that there was therefore no such crime. 1605A says goods essentially must be produced in the United States. But 1605D provides an exception to that. It says this section shall be applied in a manner consistent with United States obligations under international agreements. Well, there is an international agreement right on point that governs government procurement, as in this case. That's the World Trade Organization Government Procurement Act, WTOGPA. And under that treaty, the U.S. and the EPA are obligated to treat the good of other parties to that agreement, which include Korea, as the same as U.S. goods, meaning that to buy U.S. goods provision under 1605A is written out for those parties under 1605D, for those parties to the WTOGPA. Now, the government has cited a note by a law student for the proposition, well, that doesn't apply to certain states or municipalities. And to his defense, that law student did not address the question that faces this court. And in any event, that's a wrong interpretation of the statute. Section 1.3 of the statute specifically provides that when the government, when a party to that treaty, requires certain provisions to be in contracts entered into by municipalities or other entities that are not party to the treaty, then the requirements, the equal treatment requirement under Article III shall apply mutatis mutandis to such requirements. By Latin, it's nonexistent, not just rusty. But under the dictionaries, the definition of that is, this is a phrase of frequent practical occurrence, meaning that matters or things are generally the same, but to be altered when necessary as to names, offices, and the like. So in other words, there's going to be differences in personnel, departments involved between the U.S. government and municipalities and states. Nonetheless, the equal treatment requirement of Article III still applies to those, because in this case, the U.S. government is telling those entities what they are going to put in their contract. This is what I would call an anti-strawman purchase provision. So in other words, the government is saying, look, I can't, under this treaty, I can't buy a gun, but I'll give you the money to buy the gun for us. That way I'll get around the treaty. Well, that provision doesn't allow that to happen. What the government is saying is, we're going to, we cannot, if we bought these goods ourselves directly, we would have to allow Korean goods to be used. We're trying to get around that by giving money to somebody else to buy it for us. And it's just not allowed under Article III. Counsel, you're wading down, though, into the technicalities of this act to which your client was not subject. I mean, the issue here on the wire fraud charge, as I understand it, is simply, did he represent to the municipalities that these products were made in America? I don't think that's an accurate interpretation of it. What the indictment alleges, and what should have been required to prove at trial, is that he falsely promised with the intent to provide blowers that were compliant with Section 1605. That means that if the treaty means his goods, as is, from Korea are compliant, then he didn't engage in a fraudulent scheme. I think, yes, the indictment references the ARRA, but the representation he was making was with respect to the Buy American version. I mean, he wasn't accused of making any kind of representations to the purchasers about legal advice, such as whether there were treaties that exempted Korea. I mean, he never said, hey, there are treaty provisions that exempt Korea, so you don't really have to worry about this. I'm making these things in Korea, so no worries. The ARRA doesn't apply. He was specifically representing and charged in the indictment with representing them as having been made in America. Again, I don't think he said he was going to make them in America. There's no representation in the indictment itself that he said he represented or said he would make them or assemble them in Batavia. That's not an accurate allegation by them as to what was actually in the indictment. In any event, the question is whether he was charged with a crime. If it was not a crime for him to ship goods all completely made from Korea under Section 1605 because of application of the treaty, then there was no crime alleged. What if he made a misrepresentation or a series of misrepresentations and we end up going with you with regard to this legal impossibility? How do we gauge whether or not misrepresentations that Mr. Hwan made are material or not? Well, to me, if he's making misrepresentations but that doesn't constitute a crime or even a fraudulent scheme, then that's not a proper allegation of wire fraud. So it's a lot of sound and fury, but it signifies nothing. The real question here is did the indictment allege a crime? But the allegations of the indictment itself establish there was no crime because Korean goods are treated the same as goods made in the U.S. It does get into the details of the treaty, but nonetheless, there are lists of entities that are required to comply with the treaty, and they include Oregon, Vermont, California, Massachusetts, which are at issue in this case. And most importantly, it includes in Annex 3 under List C, U.S. Environmental Protection Agency Clean Water and Drinking Water State Revolving Funds for projects funded by reallocated ARRA funds, exactly what we're talking about here, where the contracts are signed after February 17, 2010, which is the case here. All these contracts were signed after that date. So the treaty, by its provisions, renders the allegations a nullity. It's just not a crime what he did. That's consistent with U.S. regulations under Section 1605, the Recovery Act. It's all the same. Counsel, he's not charged with violating the Recovery Act. He's charged with committing wire fraud. Correct. And that's different. So the question is whether he lied, whether he lied. And you said he wasn't accused of saying things were made in Korea. I mean made in the United States. It said he was accused of affixing signs that said assembled in the U.S. Sorry, I said made instead of assembled. Assembled in the U.S.A. And that, you know, I lost track of the other one. He falsely represented that they would be, oh, that they complied with the Buy American provisions. So all of the stuff that you're talking about is beside the point. It's not what the indictment focuses on. Well, two points, Your Honor. The Made in the U.S.A. label is not wire fraud. That's something that's affixed. There's no electronic communications. There's no transport or communications there. It's also not material because nobody saw it. It was under steel when it came here. It never got to the sites. Okay, that's part of the smuggling statute, Judge. Fine. The more important point, though, Your Honor, is that the wire fraud alleged here is that he promised to provide blowers that were compliant with Section 1605 of ARA or the Recovery Act. He did. Whether you look at the treaty or, as I'll get to now, if you look at the and this is why he's entitled to an acquittal, is because there was only he was alleged to have promised to provide blowers that were compliant. But there's wire fraud, a fraudulent scheme, which is a necessary element, only when you have a contemporaneous intent to defraud. So the government presented a lot of evidence about statements made from June 2009 through March 2010. And as the district court itself found, she thought it was clearly established that at the time that those representations were made, Han honestly intended to comply with ARA or Section 1605. That's amply supported by the evidence and is enough to create a reasonable doubt in anybody's mind. First of all, the allegations about references are to internal communications. If we're going to engage in fraud, why are we engaging in internal fraud amongst ourselves? Those internal communications are enough to show an honest intent by him and everybody else at K-Turbo to honestly comply with what they understood the requirements at that point to be. Under the case law, the mere fact that he ended up not being able to fulfill the promises that he made during that time period in the form that he made them is not enough to show intent, contemporaneous intent. And the government hasn't cited any evidence whatsoever during that time period to show that he had a contemporaneous intent to defraud. Again, all of the evidence shows the contrary. The fact that he spent a lot of money, he spent a lot of time, he spent a lot of effort, he bought all the tools and equipment, he set up a whole place to accomplish exactly what he promised, shows that he honestly intended, as the district court found, to comply according that way. Now, overlaying all that, though, there was a transition going on. There was a transition in the EPA as to the guidelines they issued in September and then later in October, regulations or guidance, which said, by the way, produced in the USA doesn't mean actually you have to physically make it here. It means you only have to substantially transform it here. And then they clarified even more. Well, substantially transformed means you only have to answer two out of five of three questions, yes. Did it take a lot of time to do on-site? More importantly, they said it could all happen on-site, meaning at these waste treatment centers. Did what you were supposed to do to get it functional, did that take a lot of time? Did it take a lot of high skills? You have here, under the guidance, the statement, assembly and installation includes sophisticated adjustments, calibration, et cetera, by the U.S. company, which must necessarily be done on-site to meet project performance specifications and establish warranty conditions. That's like a godsend to K-Turbo. That came out in October. K-Turbo transitioned to that requirement. It's indisputable that the contracts required them to do exactly that, to engage in calibrations, to set it up, adjustments, every one of the contracts. And not only that, but the government itself, its own EPA witnesses said that what K-Turbo was supposed to do on-site would have meant that they could answer yes to two of the five questions of subpart three of the three-question test, meaning that what they intended to do on-site would have been substantial transformation. And that's key because what the government did here is they said, well, look at his earlier things, look at his earlier promises that he was going to build in Batavia. Don't pay attention to what happened later. Look at that. But the problem is that they never tied that up to actual misrepresentations to the five municipalities involved in the indictment. So, for example, for Indian Springs, our promise to Indian Springs was not we were going to assemble it in Batavia. We never said that to Indian Springs. We said that we would comply with the EPA test based on a good-faith interpretation of the EPA test, the three-question test. That's an honest answer. That's an honest statement. That's what they tried to do. That's what they were required to do. So there was completely insufficient evidence to prove at trial anything beyond a reasonable doubt. He was entitled to acquittal under those counts. The problem here is that the government essentially constructively amended the indictment from the time the grand jury issued it to trial. They started out by saying, you promised to make blowers compliant with Section 1605. At trial, they said, we don't care whether you were compliant with 1605. We don't care. This isn't a case about violating ARRA. It's a question about whether you violated your promises back in 2009 to assemble it in Batavia. But that's not what the indictment alleged. By doing that, they essentially made it impossible for him to defend himself because it changed the entire theory. It prevented him from showing that he actually intended still, even after March 2010, to fully comply with his promises by providing substantial transformation on site. The same allegations were in the South Burlington-Vermont case. We never promised we would make it in Batavia. We promised to them that we would make it, we would comply with the three-part EPA test, which is what we intended to do. Um... So, because of that constructive amendment and a change, the government broadened the potential liability of FON, and that's improper under this Sotil case, and consequently... ..the conviction must be reversed and vacated. I'm sorry, the Styron case, the US Supreme Court Styron case. I would like to reserve, unless you have any questions, the rest of the time for a vote. Thank you.  My name is Raj Lad and I represent the United States in this appeal. The smuggling charge here had a number of elements, and the most important element is that the defendant knew that what he was doing was contrary to law. So the smuggling statute doesn't simply take any regulatory violation... Contrary to what law? So in this case, we allege the law requiring that goods imported into the United States must be conspicuously marked with the English name of the country of origin. And that affirmative command, which is clear and unequivocal, is the same as saying, thou shalt not do the opposite. So by affirmatively requiring that the goods be marked, it prohibits not marking the goods. And here we had something that was more egregious than not marking the goods or a type of mismarking that could be the part of, you know, some complicated factual issue that would need to be resolved by the World Trade Court. It was marked assembled in the United States when it had already been assembled and it was coming across the border from Korea. Counsel, can you address the defendant's parade of horribles argument that if contrary to law really means contrary to any law, then many minor regulatory violations can then be construed as violations of 545? Yes, and that is really the requirement that he understand that what he is doing is contrary to law. And I think it's actually a regulatory scheme that works pretty well. The inadvertent mismarking, the typical sort of mismarking that appears to be contemplated by the statute can be cured once it's brought to your attention. And it makes sense that that doesn't require bad intent because it's a regulatory scheme and we don't want every case of goods coming across the border to require an entire fraud investigation. But in the case where you attempt to evade those requirements by deliberately acting in a way you know to be illegal, it makes sense for there to be criminal penalties to deter people from engaging in exactly that sort of conduct. Although one thing about the mens rea argument that you're making is that 545 also says that proof of defendant's possession of such goods unless explained to the satisfaction of the jury shall be deemed sufficient to authorize conviction. Does that mean then that possession indicates knowledge or is that getting at something else? I believe it indicates knowledge of the condition of the goods. I don't think it indicates knowledge of the law. That would be a bridge too far. And certainly that's not how the jury was instructed in this case. In this case, the jury was instructed that the defendant needed to know that what he was doing was contrary to some law, that it was illegal. So that's certainly not what happened here. The jury necessarily concluded that when the defendant marked those goods and sent them to the United States, he knew, or had his employees do that, he knew what they were doing was illegal. It is an unusual case, though. I couldn't find cases that were really exactly like this because it does seem like 545 is more often used for things that when you're importing, you know, there's many Prohibition-era cases interpreting this statute, that it more often has been used when things are being imported and that are themselves illegal. It's certainly commonly used in that, and I think part of it is the timing of many of the cases, but it is also used in the case of import controls and the companion statute 544 is used for export controls, and those typically are regulatory schemes. So in the case involving the rugs from Iran, that was a regulatory scheme. Nothing inherently illegal about a rug, only the fact that it was made in Iran makes it illegal. The desert bighorn sheep case, Cooper's, is another good example. The sheep antlers could be legally brought into the United States. You just had to show you had an export permit from Mexico that you had legally taken this animal, and the fact that the defendant in that case didn't have that is what rendered it violated. It's still a little bit different, though, because in Iran, while there's nothing inherently illegal about a rug, it was against the law to bring in rugs from Iran. Or in the case of bringing in some of these endangered species type arguments, it is illegal to bring them in unless lawfully taken, and here there was no scenario in which sending these blowers in was contrary to law in the sense that it was prohibited by law to have them cross the border. So it's different than the cases, at least the cases that I was able to find. I think it's different in that here, had you simply marked them properly, they could have come in, so it would be very easy to comply with the law. And I think that's actually what makes this an unusual case, but one that is before the court is that the misrepresentation was so blatant. So because we have that willfulness standard, it's framed in terms of knowingly, but we have to show he knew it was illegal. That's a very high standard and something that's difficult to prove at trial unless the conduct is fairly egregious. And here marking a blower as assembled in the United States when it's coming across the border unmarked is fairly egregious, and the customs officers who intercepted those blowers, I think this is reflected from the trial record, didn't know anything about the broader investigation when they first saw the labeling, and then later agents who were aware of the investigation came out there. But it jumped out to customs as unusual that a blower would say assembled in the United States when it's coming across the border. Turning to the wire fraud scheme, the scheme alleged that the defendant defrauded the municipalities and their contractors, and that he did so in a fairly specific way. He told them he was going to comply with the Buy American provision, and he told them he would do it in a particular way, that he would substantially transform those blowers at his facility in Batavia, Illinois. That term gets tossed around a lot, but its meaning is really fairly simple. It just means you do so much to them that for all practical purposes they are made in the United States, not made overseas. And he went so far as to represent in a very specific way how he was going to do that, that he was going to purchase enclosures in the United States for the blowers. He was going to source parts here. They would be assembled here. And for the charged executions of this scheme, those particular municipalities, absolutely none of that happened. But where is that in the indictment? Where is that specificity that you're now arguing was present at trial in the indictment? Yes. So the indictment alleges that the defendant, part of the means by which he executed the scheme is that he did not substantially transform the blowers at his Batavia facility as promised. I'm paraphrasing slightly, but it's quoted in the brief as well. So that idea of the specific promises was certainly in the indictment. Did he say to the buyers that he was going to do that, or did he say he would just comply with the statute? Well, his exact representations vary a bit from case to case, but I'll just give you one example. On January 10th, he sent a signed certificate to representatives of the Ottawa Project, that's one of the municipalities, saying that the blowers were going to be assembled and tested in the United States. And, in fact, the fully assembled blowers had arrived in the United States a week earlier. So he specifically, in that instance, represented assembled and tested. But were there instances where he didn't do that, where he just said, I'll comply, I'm complying? So, yes, it varied, and it really depended on how many follow-up questions the municipalities asked. So the more they asked, the more detailed and specific his misrepresentations are. So the jury could infer from that that he was deliberately misrepresenting that he would comply because his later clarifying statements all evince that intent. He had canceled the contract. It wasn't really a contract, but he explored the possibility of ordering parts here in the United States, panels and things like that. He had canceled those before the vast majority of the representations he made that were presented at trial. So, you know, regardless, I mean, I think defendant's argument, if nothing had happened after the initial representation to the EPA in 2009 about what his plan was, the government would have a difficult case proving what his intent was. But as time goes forward and he's taking actions that are directly contrary to his stated intent contemporaneously with making those representations, the jury was certainly entitled to conclude that he intended to defraud. And the other piece of this is the jury was presented with evidence as to materiality. Every single municipality at issue at this trial, representatives testified that they would not have purchased the blowers if they had known that the defendant was actually assembling them in Korea. The defendant was aware at his facility in Batavia, which he would travel to from time to time, a marked-up copy of the EPA guidance was found. EPA had been tasked with administering the Buy American regulation for projects to which they supplied funding, and they had rejected the argument that the World Trade Organization agreement negated the Buy American provision. The technical reasons are complicated. It has to do with the way the EPA supplies the money, which is not directly to the projects, but through a series of state-run revolving loans. But what the defendant knew is that the EPA didn't agree with this argument that he's now raising on appeal. He could have chosen to contest that. He could have told the municipalities, I don't think you have to comply, you should buy my blowers anyway. Instead, he chose to trick them into buying his blowers, and they said if they hadn't been tricked, they wouldn't have bought them. So we know that the representations were material because the buyers relied on them. Can you address your argument that he either waived or forfeited the constructive amendment argument that you alleged in the indictment that this was representations about compliance with the ARRA, but to the extent that you might have proved that it was more generally lies about where the blowers were made, that's a variance? He raised a different constructive amendment argument below. So he had already raised the issue of constructive amendment, but he never argued that the government was limited to proving that he promised to deliver compliant blowers and then failed to deliver compliant blowers, this sort of narrow technical argument that attempts to turn the case completely on the World Trade Organization or these foreign trade policies and laws. So that's a new argument. Ultimately, I don't think it's particularly important, the waiver, because I think it's also just simply belied by the plain language of the indictment. I'll also note there was ample discovery in this case of Santiago Proffer explaining what the government's evidence at trial would be. So the defendant was definitely on notice as to what he was going to be called to defend at trial. Is the dependent correct as a matter of law that the chain of documentation results in a manufactured good not being violative? I think the EPA had it right that in the way these projects are funded, the defendant's goods were not exempt. They had to comply with the Buy American provision, and I think that's also sort of borne out by the course the defendant chose to take, which is rather than attempt to convince the EPA they were wrong or that his goods in some way complied, he took the course of just misrepresenting where they were actually being manufactured. I want to turn to the government's cross-appeal in this matter. The loss amount at sentencing was a very contested issue spread out across multiple hearings that the district court ultimately ruled on and found an actual loss in the amount of $180,000, and that was at the February 28th sentencing proceeding. The government sought a much higher loss figure based on the intended loss, so essentially what the district court did is take only the payment for the blowers that were actually delivered and used that as the loss amount and ignored the other contracts that the defendant had for which his company was never paid. So to the extent there was error there, that was certainly to the defendant's benefit. It reduced the loss from over $1 million down to approximately $180,000. The defendant was sentenced on the basis of that, actually received a below guidelines sentence, and at that point he filed his first notice of appeal. Before that, judgment was reduced to writing on a motion by the defendant filed in the district court to which the government was not given an opportunity to respond. The district court brought the parties back in and under Rule 35 said that her prior guidelines calculation had been clearly erroneous and substituted it with a new guidelines calculation. That is contrary to the language of Rule 35A, to the committee note accompanying it, and to this court's precedent, all of which say a discretion, the exercise of discretion with regard to the sentencing guidelines, the application of the sentencing guidelines is not the type of error cognizable under Rule 35A. It's a provision that really applies under very narrow circumstances. The reported cases involve things such as imposing a sentence below the statutory mandatory minimum. Correlating error, although I don't believe there are cases where this has to be imposing a sentence above the statutory maximum, a sentence that simply cannot be imposed. But is it really? I mean, yes, I agree it applies in narrow circumstances, but if the district court applies the wrong legal standard in a way that we would reverse as clear error on appeal, why wouldn't that satisfy Rule 35? So I think it is because of the narrow purpose of Rule 35. It's only to where there is an efficiency because the error is so apparent that it's an impossibility. And the legislative history here is that for a while, Rule 35 prohibited any of these modifications, and the case relied upon by the defendant involving the sentence under the mandatory guidelines fell in that narrow area. And then it was basically Rule 35A was amended to correspond with that case, which is only within 14 days, only in these narrow circumstances. This error, first of all, to the extent there was an error here, was not an error that harmed the defendant. The loss amount was certainly at least the $180,000 that the district court found, so we reject the defendant's contention that there was any sort of clear error here. But the proper way to seek review of a district court's decision on a contested issue at sentencing that has clearly been the subject of thought and the exercise of discretion by the district court is through the appeal. If either party is dissatisfied, there can be an appeal. I totally agree, but you said discretion of the court, right? I guess what I'm just asking is if you accept the premise that it was a clear legal error, that it wasn't the district judge changing her mind about how to exercise discretion, or it was a hotly disputed legal question to which there was not a clear answer, then that's not clear error that would be reversible as clear error on appeal. But if it was the application of clearly the wrong legal standard such that it flew in the face of quite settled law, would you agree that Rule 35 then permitted its correction? I wouldn't, Your Honor, and my hesitation comes from the committee note and from this court's decision in Clark, which appears to just segregate out the application of the sentencing guidelines entirely. In the absence of the committee note, I would agree that clear error would simply mean clear error, but the fact that that committee note is there and that this comes up in every case where it's mentioned, even the unpublished decision that's in the governance brief, Vincent, I think that clear error, it's really arithmetical, technical, or other clear error, and the appearance of those three terms together combined with the committee note seems to say this is an even more narrowly circumscribed type of error that can be corrected. I would think that if it would require an automatic remand, that's the sort of thing that can be corrected under Rule 35A. And I think that may well be the case. It's something that would be an automatic remand. The parties agree it's just simply erroneous in a mathematical sort of way. What we have here is an argument about the government's evidence that was presented at the sentencing, although largely the trial evidence that the court brought, and what that proved up as to the defendant's intended loss under the sentencing guidelines. And so that is a very fact-specific question, depends on the record developed at trial, and is an area where the district court does have quite a bit of discretion in making a factual finding as to what the loss actually was. So that, I think, is exactly the type of guidelines issue that the committee note and then the later cases are identifying as things that are simply too murky to be resolved through Rule 35, even if potentially this court in reviewing the decision might reverse. I will say on the merits of this, though, again, the government's evidence was that the defendant had secured $1.6 million in blower contracts by representing that the blowers were going to be made in America when they were not. And so that government's position is that was the intended loss. Even if the defendant received an offset, which we contested, but the district court originally raised for the blowers he actually delivered, which weren't compliant, but giving him the benefit of the doubt, it's still $1.1 million in intended loss. And what the district court did, I think, is the narrowest possible interpretation. The district court took the actual loss, the actual amount of money that the municipalities paid to the defendant's company for blowers that simply were not what they were promised and used that as the loss amount. So that's certainly not a clear error or the type of clear error that could give rise to relief under Rule 35A. Yeah, but if they didn't lose any money, did they? Well, they paid the money and they didn't receive it. They got what they paid for. Well, they didn't, and I think it goes back to this court's precedence in the disadvantaged business enterprise cases. So this particular issue with the Buy American Act has not come up before in this court, but a somewhat similar type of fraud has where somebody represents my company is owned by a woman and, therefore, entitled to get certain set-aside contracts from the city. And in those cases, this court has held that because the city or the work, the street sweeping, you know, the widgets, you know, whatever it was that was called from the contract, but the other thing they wanted, which was the perceived social benefit of having that work performed by a particular person, that the money they paid or intended to pay is the loss. And so that is the basis of the loss calculation here. And also note, to the extent that the defendant, the municipalities got something in terms of a blower, I think the district court in its remarks at sentencing under the 3553A factors, at the original sentencing on February 28th, noticed that it was going below the advisory guidelines in part for that reason. So that was taken into account by the court here under the 3553A factors. So unless there are further questions from the panel, the government would ask that the conviction of the defendant be affirmed, but that the later judgment, the one imposed on March 14th of 2018, be vacated and that the case be remanded to the district court with instructions that a written judgment be issued that conforms to the sentence orally pronounced on February 28th. Thank you. Thank you, counsel. First I'll address the question of smuggling. I've never seen any case that said that just because somebody knew what he was doing was wrong that that constitutes smuggling. The question here is, was it contrary to law to import something that was mismarked? And there's nothing, they haven't established any language in Section 1304 that establishes that importing mismarked goods is contrary to law. They acknowledge, in fact, that it can be cured. A mismark can be cured. Now they try to say that, well, there's a difference between an innocent mismarking and an intentional mismarking. But there's nothing in 1304 establishing that distinction. Intentionally mismarked merchandise can be cured and remarked just as innocently mismarked merchandise can be. So there's no distinction there in 1304. Anything can come in that's mismarked. The case law that we cited shows that. There's nothing, the theory is just untethered to the language of the statute itself. In terms of the wire fraud, the particular promise in the allegation or in the indictment is that he represented that he would provide blowers compliant with Section 1605. And I laid out in our brief all of the allegations establishing that. Their sole response to that is to refer to Paragraph 3, but there's no representation there from Hahn or K-Turbo that the blowers would be assembled in Batavia. That's the key. If you don't have a misrepresentation, if you don't have a false, intentionally false misrepresentation, there's no wire fraud. They had to show that there was a misrepresentation in the indictment first and then at trial that he promised to assemble it in Batavia. They didn't allege that in the complaint. There's nothing in Paragraph 3 that says that. There's nothing in the evidence that shows that he made those kind of promises to the particular municipalities that were involved in the five counts of the indictment. He refers to one statement, and he doesn't give the year. He said something about January 10th. Joel Schomo made a representation to Ottawa, Illinois. It was January 10th, 2011. This was shortly before everything fell apart and they seized all the blowers. And that was by Joel Schomo. It was to Ottawa. It was nobody involved in the indictment here. Ottawa's not mentioned in the indictment. It talked about it would be assembled in Batavia. But this was a statement made by Schomo to sales rep, not to the actual municipality. And the key there is that Joel Schomo admitted that he made statements on his own initiative without Han's knowledge or instruction. So that is not enough to establish beyond a reasonable doubt. Their statement that the contractor said they would not have bought these blowers if they knew they were assembled in Korea is not correct. What they said is that they would not have bought them if they knew they were not compliant with ARRA. That was the key. They wanted blowers compliant with ARRA. And they would have been if they had, instead of seizing these blowers, if they had allowed us to install them, calibrate them, and program them on site. The fact that the EPA disagrees with that, I don't know that that even was established by any evidence at trial. But the point is that the regulations themselves established that, and I'm specifically talking about 2 CFR 176.90 and 176.160. They established that the WTO GPA applies to Section 16.05. Quote, the restrictions of Section 16.05 of the Recovery Act do not apply to designated country goods. Close quote. Designated country is defined to include Korea. So the restrictions of Section 16.05 of the Recovery Act do not apply to Korean goods. Period. End of analysis. He fully complied with Section 16.05. There was no fraudulent scheme, no crime. On the cross appeal, I only have a few seconds, but it was filed too late. We had a notice of appeal that was already filed. It was not ineffective. It still would have been effective to appeal the conviction, which is all we ended up doing. The only reason I filed a subsequent notice of appeal on March 28th  I ended up not doing that. They cross appealed, but the point is it was too late. And finally, on the restitution, the municipalities did get what they bargained for, and they admitted on the record that they suffered no loss. Consequently, there's no grounds for restitution, and there's no grounds for arguing that the district court acted with discretion. All it did was correct an error of law and then say, now if it had gone beyond that and exercised its discretion to set a sentence below the minimum, then he might have a point. But there's no discretionary act that they cite to by the district court, and consequently the cross appeal is without merit. Thank you. Thank you. Thanks to both counsel, and the case will be taken under advisement.